**POPE MCGLAMRY, P.C.**
Michael L. McGlamry*
Caroline G. McGlamry (Cal. Bar No. 308660)
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706
efile@pmkm.com
*pro hac vice forthcoming

*Counsel for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Rebecca Escobar, individually, and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE HERSHEY COMPANY,<br><br>Defendant. | CASE NO.  5:24-cv-06844-EJD<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial** |

Plaintiff Rebecca Escobar brings this action on behalf of herself and all others similarly situated against Defendant THE HERSHEY COMPANY ("Hershey" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

> "Hershey is focused on developing a better-for-you confection portfolio that offers a variety of choices to meet the evolving needs of our consumers… Lily's is a great strategic complement to our existing offerings in this growing segment of the confection category."
>
> *Charles Raup, President (U.S.) for The Hershey Company*[1]

1.    This case arises from Defendant's unlawful, unfair, and deceptive practices with respect to its marketing and sale of its LILY'S brand food products (the "Products" or "Product"). More particularly, Defendant has engaged in unlawful and deceptive marketing and sales practices by labeling its "LILY'S" branded products with nutrient content claims on the Product packaging while omitting mandatory disclosure statements that alert consumers to the high, dangerous levels of saturated fat contained within the Products. Only recently has Defendant included the long-required disclosure statement on its LILY'S branded products.[2]

---

[1] *Hershey to acquire Lily's*, CANDY INDUSTRY (May 18, 2021), https://www.candyindustry.com/articles/89734-hershey-to-acquire-lilys.

[2] At the time of this filing, the products included in this definition include all food products sold under the Lily's brand during the Class Period that bear similar misrepresentations and lacked the required disclosure statement.

1

2        2.      Consumers are increasingly health conscious and, as a result, many

consumers seek health-focused foods.

3

4        3.      To capitalize on this trend, Defendant manufactures, sells, and

5   distributes the Products using a marketing and advertising campaign focused on

6   claims that appeal to health-conscious consumers.

7        4.      Defendant prominently labels its Products with nutrient content claims,

8   such as "LESS SUGAR" and "No Sugar Added" on the Products.

9

10

11

12

13



14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



5. However, Defendant's use of nutrient content claims is unlawful, misleading, and deceptive because Defendant's Products contain high amounts of unsafe fats which increase the risk of severe health issues, including coronary heart disease – the number one killer of Americans every year.

6. Defendant's use of nutrient content claims is unlawful and deceptive when and where Defendant artfully omitted required disclosure statements which alert consumers to the Products' dangerous and unhealthy characteristics.

7. Consumers, in turn, have relied and continue to rely upon these unlawful and deceptive nutrient content claims and reasonably expect that each product will be "better for them," present a healthier alternative to the competition, and are unaware that the Products contain dangerously high levels of saturated fat.

8. The Food and Drug Administration ("FDA") understands this and prohibits such prominent nutrient content claims *unless* manufacturers also provide

additional information in the area immediately adjacent to the claim when the product also contain high levels of concerning nutritional components. 21 C.F.R. §§ 101.13(4); a mandate Defendant heeded only recently.

9.      The FDA requires this information because the FDA recognizes that when manufacturers tout positive nutritional aspects of a product, that is likely to be material to purchasing decisions, even though reasonable consumers may not know the concerning composition of other dangerous components in the food product.

10.     Because consumers are generally unaware about the contents of food products and the levels constituting concern, the FDA prohibits manufacturers from advertising or promoting their products with nutrient content claims *unless* they have satisfied the disclosure requirements.

11.     The FDA regulations that govern nutrient content claims are also clear that a manufacturer may not make any nutrient content claims on the packaging unless it complies with this requirement. *See* 21 C.F.R. § 101.13(b) ("A nutrient content claim[] may not be made on the label...unless the claim is made in accordance with this regulation [i.e., § 101.13]...."

12.     If a manufacturer includes nutrient content claims on a product label, it must comply with the disclosure requirements outlined in 21 CFR 101.13(h):

> If a food...contains more than 13.0 g of fat, 4.0 g of saturated fat, 60 milligrams (mg) of cholesterol, or 480 mg of sodium per reference amount customarily consumed, per labeled serving, or, for a food with a reference amount customarily consumed of 30 g or less or 2 tablespoons or less, per 50 g (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50 g criterion refers to the "as prepared" form), then that food must bear a statement disclosing that the nutrient exceeding the specified level is present in the food as follows: "See nutrition information for ____ content" with the blank filled in with the

identity of the nutrient exceeding the specified level, e.g., "See nutrition information for fat content."

13.     In addition to being unlawful under 21 CFR §§ 101.13, Defendant's prominent nutrient content claims on the front of the label while omitting the required disclosure statement concerning saturated fats, has misled reasonable consumers. Had Defendant included the disclosure statement concerning saturated fat, as it was required to do under the law, it would have revealed that the product contains dangerously high levels of saturated fat. That information was material to reasonable consumers.

14.     Moreover, in violation of federal and state regulations, Defendant attempted to perpetuate this deception by prominently making health focused nutrient content claims on the labeling of its Products, without making mandatory disclosures, in an effort to mislead and deceive consumers that its Products are "better for them" and a healthier alternative to the competition throughout its marketing and advertising.

15.     By making nutrient content claims that highlight the Product's positive aspects, without including the mandatory disclosure statements to alert and inform consumers, Defendant has misrepresented the benefits of its Product.

16.     This material omission has led and leads consumers to believe that the Product is healthier and better for them than competing food products.

17.     Reasonable consumers purchased the Products believing, among other things, that they were accurately represented. Specifically, reasonable consumers believed that the Products contained accurate label information and representations. Reasonable consumers would not have purchased the Products if they had known

about the misrepresentations and omissions, or would have purchased them on different terms.

18.     In stark contrast to the "better for you" and health-focused representations, Defendant's Products contain unhealthy levels of saturated fat. In its discussion of saturated fat, the American Heart Association states, "Decades of sound science has proven it can raise your "bad" cholesterol and put you at higher risk for heart disease."[3]

19.     Cardiovascular Disease is the leading cause of death for men and women in the United States, taking one life every 37 seconds.[4]

20.     Defendant's unlawful and misleading labeling caused Plaintiff and members of the class to pay a price premium.

21.     Plaintiff brings this action individually and on behalf of those similarly situated and seeks to represent a Nationwide Class and a California Class. Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, restitution, other equitable relief, and disgorgement of all benefits Defendant has enjoyed from its unlawful and/or deceptive business practices, as detailed herein. In addition, to the extent full and complete corrective action has not been instituted, Plaintiff seeks equitable relief to stop Defendant's unlawful conduct in the labeling and marketing of the Products and conduct a corrective advertising campaign concerning Products sold prior to Defendant's recent label correction.

---

[3] American Heart Association, *Saturated Fat*, http://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/saturated-fats.
[4] Heron M., *Deaths: Leading causes for 2017*, NATIONAL VITAL STATISTICS REPORTS; vol. 68 no. 6, National Center for Health Statistics. 2019 *available at* https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_06-508.pdf.

**JURISDICTION AND VENUE**

22.    This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the California consumer market and has distributed or distributes the Products to many locations within this District and hundreds of retail locations throughout the State of California, where the Products are purchased by thousands of consumers every day.

23.    This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiffs class, any member of the plaintiffs class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

24.    Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff's purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District.

**DIVISIONAL ASSIGNMENT**

25.    Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events giving rise to the claims arose in Santa Clara County, and this action should be assigned to the San Jose Division.

**PARTIES**

26.    Plaintiff is a citizen of California.

a. Plaintiff has purchased the Product on multiple occasions during the Class Period at retailers throughout Santa Clara County including Sprouts stores located in Sunnyvale, Cupertino, and Santa Clara. Plaintiff has purchased during the Class Period, *inter alia*, the Dark Chocolate Baking Chips, Peppermint Flavor Baking Chips, and the Coconut Dark Chocolate Bar. These purchased products do not include the required disclosure statements.

b. Plaintiff purchased the Products for personal consumption.

c. When Plaintiff saw Defendant's representations on the Products prior to and at the time of purchase, she relied on Defendant's prominent nutrient content claims on the Products.

d. Plaintiff made each of her purchases after reading and relying on the nutrient content claims and the truthfulness of Defendant's labels. Had Defendant complied with the law and not made the nutrient content claims on the Products' packaging, she would not have been drawn to the Products and would not have purchased them. At a minimum, Plaintiff would have paid less for each Product.

e. Moreover, had Defendant included the mandatory disclosure statement, as FDA regulations require, Plaintiff would not have purchased the Products or would have, at minimum, paid less for them.

f. Plaintiff interpreted the nutrient content claims made on the Products' packaging, in the absence of a disclosure statement, to mean that the Products were healthier and a better alternative than other products that included mandatory disclosure statements.

g. Plaintiff continues to desire to purchase health-focused products, including those marketed and sold by Defendant, and would like to purchase products that are beneficial to a healthy lifestyle. If the Products that currently make unlawful nutrient content claims are reformulated to ensure they provide the consumer with the benefits of the nutrient content claims without concerning levels of saturated fat, or their labels are changed, to the extent they have not been changed, to provide non-misleading information, Plaintiff would likely purchase those Products again in the future but will not do so until then. Plaintiff regularly visits stores where the misbranded Products and other food products were and are sold. Because Plaintiff does not know the formula for Defendant's products, which can change over time, Plaintiff will be unable to rely on Defendant's labels when shopping for food products in the future absent an injunction that prohibits Defendant from mislabeling its Products and/or requires notification of the past prohibited practice. Plaintiff would also be forced to reanalyze each Product that makes a nutrient content claim but fails to include a disclosure statement at each time of purchase. In addition, at present Plaintiff cannot rely on the accuracy of Defendant's labels for the entire line of Products, which Plaintiff is also interested in purchasing with labeling that comports with regulations. Should Defendant begin to market and sell a new line of products, Plaintiff could also be at risk for buying another one of Defendant's products in reliance on the same or similar misrepresentation and omissions.

h.  On December 9, 2024, pursuant to the California Consumer Legal

Remedies Act, California Civil Code section 1750, *et seq.*, and pursuant

specifically to Civil Code section 1782, Plaintiff notified THE HERSHEY

COMPANY of violations of the Act and demanded that it remedy such

violations within thirty (30) calendar days from the receipt of said notice

letter. Specifically, Plaintiff's letter stated, *inter alia*, "Ms. Escobar

acknowledges that you have recently included the long-required

disclosure statement on your Lily's branded products. But that does not

account for or cure past sales or violative product on store shelves and

advertised on-line and elsewhere. Said Notice further provided: to cure,

correct or otherwise rectify the identified violations, Plaintiff demands

that Hershey (1) to the extent not already done, cease and desist from

continuing to mislabel the Products; (2) identify and notify all consumers

similarly situated of the past and/or ongoing product packaging defect;

(3) issue an immediate recall on any Products bearing misleading

representations and omissions; and (4) make full restitution to all

purchasers of the Products of all purchase money obtained from sales

thereof.

27.  Defendant is a Delaware corporation with its principal place of business

in Hershey, Pennsylvania. From its Pennsylvania headquarters, Defendant produces,

markets, and distributes its consumer food products in retail stores throughout the

United States.

a. The marketing, business, and strategy decisions described herein originate from Defendant's headquarters and essential offices in Pennsylvania.

28. Plaintiff reserves the right to amend this First Amended Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who have knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## SUBSTANTIVE ALLEGATIONS

**A. Defendant Makes, Markets, and Sells the Product to Consumers.**

29. Defendant, at all relevant times, manufactured, labeled, distributed, advertised, and sold the Products.

30. Defendant has marketed and labeled the Products with the representations and omissions as described herein. Specifically, the Products' label contains: (1) the nutrient content claims stating that it contains ""No Sugar Added" and "LESS SUGAR" and (2) the omission of the required disclosure statement on the label concerning saturated fat which puts the these claims in proper context.

31. For example, the representations are contained in all product groups:

a. Chocolate Bars[5]

---

[5] While only a few items are shown, the Products include all Lily's chocolate bars including all flavors of the Dark Chocolate, Milk Chocolate Style, Extra Dark Chocolate, and White Chocolate style bars.



    i.

b.  Filled Dark Chocolate Bars

    i.

c.  Chocolate Baking Chips[6]

---

[6] While only a few items are shown, the Products include all Lily's chocolate baking chips.



i.



ii.

d.  Chocolate Baking Bars[7]



i.

[7] While only a few items are shown, the Products include all Lily's chocolate baking bars.



    ii.

   e.  Peanut Butter Cups



    i.

   f.  Chocolate Covered Nuts[8]



    i.

---

[8] While only a few items are shown, the Products include all Lily's chocolate covered nuts.

g. Caramels



i.

h. Popcorn



i.

32. The Products contain more than 4 grams of saturated fat per adjusted serving.

33. For example, the Coconut Dark Chocolate Bar purchased by Plaintiff contains saturated fat at levels far in excess of the threshold amount.

34.     The Defendant notably omits the disclosure statement concerning the high levels of saturated fat as required for products that make nutrient content claims and also contain high levels of saturated fat.

35.     In other words, Defendant tells consumers the positive features, benefits, and characteristics of the Product without alerting the consumer to the *mandatory* information concerning the negative aspects of the Product.

36.     The use of nutrient content claims in the absence of any disclosure language represents to consumers that the Product is better for them and a healthier alternative to the competition.

37.     In other words, Defendant's unlawful and deceptive use of nutrient content claims has given it an unfair advantage in the marketplace.

**B. Defendant Deceptively and Purposefully Positions the Lily's Brand as a Better and Healthier Alternative and Uses Deceptive Tactics to Support these Misrepresentations.**

38.     In June 2021, Defendant acquired Lily's Sweets, LLC for $425MM.[9]

---

[9] Anthony Myers, *Hershey Buys Lily's Confectionary brand for $425m*, CONFECTIONARY NEWS (June 28, 2021), https://www.confectionerynews.com/Article/2021/06/28/Hershey-buys-Lily-s-confectionery-brand-for-425m.

39.    Hershey executives described the acquisition as "a great strategic fit with our multi-pronged better-for-you snacking strategy…."[10]

40.    Defendant specifically targets the Lily's brand towards consumers seeking a healthier lifestyle.[11]

41.    The acquisition has been a focus of Defendant's plan to accelerate profit growth as consumers become more focused on health:[12]



---

[10] *Id.*

[11] *No Sugar Added, No Problem! Lily's Sweets Introduces New Gummies Nationwide Just in Time for Summer*, HERSHEY (May 23, 2022), https://www.thehersheycompany.com/content/hershey-corporate/en-us/home/newsroom/press-release/press-release-detail.html?122683 ("The Lily's brand, acquired in June 2021, is part of The Hershey Company's growing portfolio of better-for-you (BFY) snacks as the company continues to diversify its portfolio by focusing on BFY seekers' interest – sugar reduction.").

[12] Slide 1 taken from a presentation at Defendant's Annual Meeting of Stockholders on May 16, 2023 *available at* https://hershey.gcs-web.com/static-files/2318a592-5234-4715-b40f-dc0fdcd334d6; Slide 2 taken from a presentation at Defendant's Annual Meeting of Shareholders on May 6, 2024 *available at* https://hershey.gcs-web.com/static-files/f3b1f05f-da7d-4432-a4d7-56e25269dd0b.



42.    Additionally, Defendant intends to "capitalize" on "physical and emotional wellness," and the Products play a pivotal role in this health-focused strategy:[13]

43.    The Lily's brand plays a pivotal role in increasing sales through this focus on the "better-for-you" market.[14]

---

[13] Slide taken from a presentation at Defendant's Annual Meeting of Stockholders on May 16, 2023 *available at* https://hershey.gcs-web.com/static-files/2318a592-5234-4715-b40f-dc0fdcd334d6.

[14] Slide from The Hershey Company 2023 Investor Day Presentation on March 22, 2023 *available at* https://hershey.gcs-web.com/static-files/e81070ee-5db9-4eb5-bf8c-787936a8d28d.



44. Defendant understands that consumers do not associate its legacy brands like Hershey and Reese's Peanut Butter Cups as healthy, health-focused, or "better for you" food items.

45. As a result, it purposefully markets the Lily's brand as a healthier alternative to increase profits by focusing on an additional demographic of consumer.

46. In April 2022, Defendant told investors and the public that "Lily's is on track to fully integrate into our U.S. business next month as part of our holistic better-for-you Commercial Team. This team will **capture untapped opportunity** in the confection category by innovating on our core brands…."[15]

47. One tactic in this plan was the omission of disclosure statements on the Lily's brand Products.

48. Defendant is, and at all relevant times was, aware that products with excess levels of saturated fat require disclosure statements when nutrient content claims are made on the packaging.

---

[15] The Hershey Company – First Quarter 2022 Earnings Results Prepared Remarks (Apr. 28, 2022), at 4, https://hershey.gcs-web.com/static-files/b4bd0019-3f46-41ba-ade4-9717f6c77d48 (emphasis added).

49.    This is shown by comparing its non-health focused legacy brands with the Products:[16]







[16] Product excerpted to zoom in on disclosure statement. Emphasis added in red.







50.     Defendant's acquisition and positioning of the Lily's Sweets brand has led to significant increases in revenue:[17]

> In 2021, we saw positive retail sales growth in every one of our top 20 confection franchises with an average gain of over 12%. Reese's retail sales have grown nearly 25% the past two years, driving over 20% of total category growth despite only representing 9% of category sales. **We acquired Lily's, a fast growing, premium better-for-you offering to drive scale and leadership in this key subcategory alongside our Hershey branded zero-sugar items. And we set sell-through records for every one of our major seasons last year.** This has enabled us to retain over 80% of our 2020 share gains, resulting in a two-year share gain of over 130 basis points.

51.     Using this strategy, Defendant expected even further growth:[18]

> Now, let me shift gears and share perspective and expectations for 2022. From a top line perspective, we expect net sales growth of 8% to 10%, with a 3-point to 4-point benefit from the acquisition of Dot's, Pretzel's and Lily's. Price is anticipated to be the primary driver of growth with solid price realization expected across the entire portfolio.

---

[17] The Hershey Company Fourth Quarter 2021 Earnings Prepared Remarks (Feb. 3, 2022), at 2, https://hershey.gcs-web.com/static-files/e0f8f1be-b506-4911-887c-90d0d166d64d (emphasis added).

[18] *Id.* at 5 (emphasis added).

52.     Defendant purposefully positions Lily's brand as a "better for you" brand in comparison to its legacy brands, and Defendant omitted disclosure statements to boost its profits while deceiving consumers.

**C. Defendant Perpetuates Its Deceptions throughout Its Advertising and Marketing.**

53.     Defendant's deception is and, at all relevant times, was not limited to the packaging. It furthers the deception through targeted marketing and advertising.

54.     Defendant used and uses nutrient and health-focused hashtags in its social media marketing.

55.     For example, #nosugaradded, #sugarfreechocolate, #lowcarbdessert, #glutenfree, and #lowcarbchocolate.



1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22
23
24



25
26
27
28

AMENDED CLASS ACTION COMPLAINT





56.     Additionally, Defendant uses nutrient and health-focused language in its advertisements and other social media marketing.

57.     For example:

a. "[A] chocolate bar that still tastes amazing without any added sugar."



b. "Choose sweetness, without the sugar."



c.  "Less sugar makes for a sweeter life."



**D. The Products Contain Dangerous Levels of Saturated Fat.**

58.     Defendant's Products contain high levels of saturated fat.

59.     As demonstrated by the studies cited below, consuming the Product is unhealthy as it increases risk of CHD, stroke, and other morbidity.

60.     Each Product contains 6.25 to 11 grams of saturated fat per adjusted serving size.

61.     The Products contain 56% to 175% more saturated fat than the threshold of concern for the FDA.

62.     These levels are similar to foods that consumers do not expect to be represented as health-focused or better for them.

AMENDED CLASS ACTION COMPLAINT

63.    These high levels of saturated fat are present in even small amounts of Defendant's Products.

64.    For example, one 30 gram serving of the Lily's Coconut Dark Chocolate Bar has more saturated fat than two large McDonald's fries.[19]

65.    Additionally, one 30 gram serving of the Lily's Intensely Dark Chocolate Bar has more saturated fat than a KFC Fried Chicken Breast combined with two KFC Fried Chicken drumsticks.[20] In other words, a mere 30g serving of chocolate has 28% more saturated fat than three pieces of fried chicken from KFC.

66.    Every single Product contains saturated fat levels that exceed concern thresholds as dictated by the FDA.

**E. Saturated Fat Consumption Increases the Risk of Cardiovascular Disease and Other Morbidity**

67.    Cholesterol is a waxy, fat-like substance found in the body's cell walls. The body uses cholesterol to make hormones, bile acids, vitamin D, and other substances. The body synthesizes all the cholesterol it needs, which circulates in the bloodstream in packages called lipoproteins, of which there are two main kinds—low density lipoproteins, or LDL cholesterol, and high-density lipoproteins, or HDL cholesterol.

68.    LDL cholesterol is sometimes called "bad" cholesterol because it carries cholesterol to tissues, including the arteries. Most cholesterol in the blood is LDL cholesterol.

---

[19] In just a single serving, the Lily's Coconut Dark Chocolate Bar has 7 grams of saturated fat. An entire large order of McDonald's fries contains 3 grams of saturated fat. https://www.mcdonalds.com/us/en-us/product/large-french-fries.html.
[20]    KFC NUTRITION MENU, https://www.kfc.com/full-nutrition-guide.

69.    HDL cholesterol is sometimes called "good" cholesterol because it takes excess cholesterol away from tissues to the liver, where it is removed from the body.

70.    Total and LDL cholesterol blood levels are two of the most important risk factors in predicting coronary heart disease (CHD), with higher total and LDL cholesterol levels associated with increased risk of CHD.[21]

71.    High LDL cholesterol levels are dangerous because "[e]levated blood LDL cholesterol increases atherosclerotic lipid accumulation in blood vessels."[22] That is, if there is too much cholesterol in the blood, some of the excess may become trapped along artery walls. Built up formations of cholesterol on arteries and blood vessels are called plaque. Plaque narrows vessels and makes them less flexible, a condition called atherosclerosis.

72.    Thus, "[f]or the health of your heart, lowering your LDL cholesterol is the single most important thing to do."[23]

73.    The consumption of saturated fat negatively affects blood cholesterol levels because the body reacts to saturated fat by producing cholesterol. More specifically, saturated fat consumption causes coronary heart disease by, among other things, "increas[ing] total cholesterol and low-density lipoprotein (LDL) cholesterol."[24]

---

[21] *See, e.g.*, Dr. Dustin Randolph, *Coconut Oil Increases Cardiovascular Disease Risk and Possible Death Due to Heart Attacks and Stroke* (Sept. 19, 2015) ("Heart attack and stroke risk can be largely predicted based on total and LDL cholesterol levels in people" because "as cholesterol levels increase so does one's risk of symptomatic and deadly heart disease."), *available at* http://www.pursueahealthyyou.com/2015/04/coconut-oil-increasescardiovascular.html.

[22] USDA Center for Nutrition Policy and Promotion, Dietary Saturated Fat and Cardiovascular Health: A Review of the Evidence, Nutrition Insight 44 (July 2011) [hereinafter, "USDA Review of the Evidence"].

[23] Pritikin Longevity Center, *Is Coconut Oil Bad for You?*, *available at* https://www.pritikin.com/your-health/healthy-living/eating-right/1790-is-coconut-oil-badfor-you.html.

[24] *Supra* note 22, USDA Review of the Evidence.

74.    Moreover, "[t]here is a positive linear trend between total saturated fatty acid intake and total and low-density lipoprotein (LDL) cholesterol concentration and increased risk of coronary heart disease (CHD)."[25]

75.    This linear relationship between saturated fat intake and risk of coronary heart disease is well established and accepted in the scientific community.

76.    For example, the Institute of Medicine's Dietary Guidelines Advisory Committee "concluded there is strong evidence that dietary [saturated fatty acids] SFA increase serum total and LDL cholesterol and are associated with increased risk of [cardiovascular disease] CVD."[26]

77.    In addition, "[s]everal hundred studies have been conducted to assess the effect of saturated fatty acids on serum cholesterol concentration. In general, the higher the intake of saturated fatty acids, the higher the serum total and low density lipoprotein (LDL) cholesterol concentrations."[27]

78.    Importantly, there is "no safe level" of saturated fat intake because "any incremental increase in saturated fatty acid intake increases CHD risk."[28]

79.    For this reason, while the Institute of Medicine sets tolerable upper intake levels (UL) for the highest level of daily nutrient intake that is likely to pose no risk of adverse health effects to almost all individuals in the general population, "[a] UL is not set for saturated fatty acids."[29]

---

[25] Institute of Medicine, Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids, at 422 (2005) [hereinafter "IOM Dietary Reference Intakes"], *available at* http://www.nap.edu/catalog.php?record_id=10490.
[26] *Supra* note 22, USDA Review of the Evidence.
[27] *Supra* note 25, IOM Dietary Reference Intakes.
[28] *Id.* at 422.
[29] *Id.*

80.     In addition, "[t]here is no evidence to indicate that saturated fatty acids are essential in the diet or have a beneficial role in the prevention of chronic diseases."[30]

81.     Further, "[i]t is generally accepted that a reduction in the intake of SFA [saturated fatty acids] will lower TC [total cholesterol] and LDL-cholesterol."[31]

82.     For these reasons, "reduction in SFA intake has been a key component of dietary recommendations to reduce risk of CVD."[32]

83.     The Institute of Medicine's Dietary Guidelines for Americans, for example, "recommend reducing SFA intake to less than 10 percent of calories." And "lowering the percentage of calories from dietary SFA to 7 percent can further reduce the risk of CVD."[33]

84.     Professor Frank Sacks from Harvard's T.H. Chan School of Public Health believes that "[t]he evidence that saturated fat causes atherosclerosis and heart disease is compelling."[34]

85.     In short, consuming saturated fat increases the risk of CHD and stroke.[35]

**F. Defendant Violated and/or Violates Identical Federal and State Regulations**

      **a.     Federal and State Regulations Are Identical**

---

[30] *Id.* at 460.

[31] Shanthi Mendis et al., *Coconut fat and serum lipoproteins: effects of partial replacement with unsaturated fats*, 85 Brit. J. Nutr. 583, 583 (2001).

[32] *Supra* note 22, USDA, Review of the Evidence.

[33] *Id.*

[34] Bonnie Liebman, *Saturated fats: the big picture,* CENTER FOR SCIENCE IN THE PUBLIC INTEREST (Oct. 30, 2021), https://www.cspinet.org/article/saturated-fats-big-picture.

[35] Mendis, *supra* note 31.

86.    The FDA oversees the regulation and labeling of food pursuant to the Federal Food, Drug and Cosmetic Act ("FDCA").

87.    The Federal Food, Drug, and Cosmetic Act expressly authorizes state regulations, such as the Sherman Law, that are "identical to the requirement[s]" of the FDCA and federal regulations. *See* 21 U.S.C. § 343-1.

88.    Identical federal and California laws regulate the content of labels on packaged food. The requirements of the Act, and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state.") The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, none of the California laws sought to be enforced here imposes different requirements on the labeling of packaged food for sale in the United States.

89.    Because the Sherman Law's requirements are identical to the requirements of the Federal Food, Drug, and Cosmetic Act and FDA regulations the Sherman law is explicitly authorized by the FDCA.

90.    The Act, 21 U.S.C. § 343(a), and the Sherman Law, provide that a food is misbranded if "its labeling is false or misleading in any particular."

91.    To be clear, Plaintiff does not allege any claims pursuant to the FDCA and Sherman Law and relies on these regulations only to the extent they provide a predicate basis for liability under state and common law, as set forth herein.

**b.    Regulations Governing the Labeling of Food Products**

92.    A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement outside the Nutrition Facts Panel, about the level of a nutrient. 21 C.F.R. 101.13(b)(1). Moreover, stating information from the nutrition facts panel (such as grams of added sugars per serving) elsewhere on the package necessarily constitutes a nutrient content claim. 21 C.F.R. § 101.13(c).

93.    The FDA has always considered nutrient content claims to be "a marketing activity." *See* 56 Fed. Reg. 60366, 60372, 60375. The FDA has long been suspicious of nutrient content claims and has repeatedly stated that such claims can be misleading, so the rules that govern them are far more restrictive. Indeed, "the general rule is that 'nutrient content claims' are not permitted on food labels" and must instead satisfy all of the requirements of § 101.13 before being authorized to appear at all. *Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015).

94.    Consumers reasonably rely upon nutrient content claims and may be persuaded that certain products will be "better for them," or be a healthier alternative to the competition.

95.    The Food and Drug Administration ("FDA") understands this and prohibits such prominent nutrient content claims *unless* manufacturers also provide additional information in the area immediately adjacent to the claim when the product also contain high levels of concerning nutritional components. 21 C.F.R. §§ 101.13(4). This is required because the FDA recognizes that when manufacturers tout positive nutritional aspects of a product, that is likely to be material to purchasing

1    decisions, even though reasonable consumers may not know the concerning

2    composition of other components.

3        96.    Because consumers are generally unaware about the contents of food

4    products and the levels constituting concern, the FDA prohibits manufacturers from

5    advertising or promoting their products with nutrient content claims *unless* they

6

7    have satisfied the disclosure requirements.

8        97.    Under 21 U.S.C. § 343(r)(1)(A), a claim that characterizes the level of a

9    nutrient which is of the type required to be in the labeling of the food must be made

10    in accordance with a regulation promulgated by the Secretary (or, by delegation,

11    FDA) authorizing the use of such a claim. See also Cal. Health & Safety Code §

12    110670 ("Any food is misbranded if its labeling does not conform with the

13

14    requirements for nutrient content or health claims" set by federal law.).

15        98.    The FDA regulations that govern nutrient content claims are also clear

16    that a manufacturer may not make any claims on the front packaging about the

17    amount of added sugar in the product unless it complies with this requirement. *See*

18    21 C.F.R. § 101.13(b) ("A nutrient content claim[] may not be made on the

19

20    label…unless the claim is made in accordance with this regulation [i.e., § 101.13]…."

21        99.    If a manufacturer includes nutrient content claims on a product label, it

22    must comply with the disclosure requirements outlined in 21 CFR 101.13(h):

23

24        If a food…contains more than 13.0 g of fat, 4.0 g of saturated fat, 60
        milligrams (mg) of cholesterol, or 480 mg of sodium per reference amount
25        customarily consumed, per labeled serving, or, for a food with a reference
        amount customarily consumed of 30 g or less or 2 tablespoons or less, per
26        50 g (for dehydrated foods that must be reconstituted before typical
        consumption with water or a diluent containing an insignificant amount,
27        as defined in § 101.9(f)(1), of all nutrients per reference amount
        customarily consumed, the per 50 g criterion refers to the "as prepared"
28        form), then that food must bear a statement disclosing that the nutrient

exceeding the specified level is present in the food as follows: "See nutrition information for ____ content" with the blank filled in with the identity of the nutrient exceeding the specified level, e.g., "See nutrition information for fat content."

100.    If a food's packaging makes a nutrient content claim, contains more than the levels outlined in Section 101.13(h), and fails to include the mandatory disclosure statement, it is misbranded.

**G. During the Relevant Time Period, and to the Extent It Is Ongoing, Defendant's Use of Nutrient Content Claims Is Unlawful Due to the Omission of the Disclosure Statement.**

101.    The Products, during the Class Period and, to the best of Plaintiff's knowledge and belief, up to the spring of 2024, all made nutrient content claims on the front label, contained more than 4 grams of saturated fat per serving, but failed to include the required disclosure statement alerting consumers to the dangerously high levels of saturated fat. Thus, the nutrient content claims made on the Products' front label were and are unlawful and were never permitted to be on the labels in the first instance under 21 C.F.R. § 101.13.

102.    Defendant's Products are, therefore, unlawful, misbranded, and violate the Sherman Law, California Health & Safety Code § 110660, *et seq.*  110660 and 21 U.S.C. § 343(a).

103.    Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, et. seq.), including but not limited to:

a. Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

– 34 –

b.  Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear on food labeling is either missing or not sufficiently conspicuous);

c.  Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

d.  Section 110765, which makes it unlawful for any person to misbrand any food; and

e.  Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

104.  Defendant's marketing, advertising, and sale of the Products also violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, et. seq.), including, but not limited to:

f.  Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

g.  Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

h.  Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

105.  The aforementioned Sherman Law provisions stem from California's traditional, historic police power to regulate food labels, which long predates the

FDCA. *See Plumley v. Massachusetts*, 155 U.S. 461, 472 (1894) ("If there be any subject over which it would seem the states ought to have plenary control, and the power to legislate in respect to which . . . it is the protection of the people against fraud and deception in the sale of food products"); *see also Clancy v. Bromley Tea Co.*, 308 F.R.D. 564, 573 (N.D. Cal. 2013) ("[s]tates have traditionally possessed the power to protect their citizens from fraud and deception in the sale of food, and therefore there is a strong presumption against federal preemption in the area of marketing food.").

106.    Moreover, while the Sherman Law directly incorporates the FDA food labeling regulations in Section 110665, Plaintiff bases claims on other Sherman Law provisions that independently prohibit the dissemination of "false or misleading food advertisements" (which include food labels) and the misbranding of food, including Sections 110705, 110760, 110765, 110390, 11039, 110398. These provisions, in particular, would exist even if the FDCA did not.

## H. The Omission of the Disclosure Statement Was Misleading Under Traditional State Law Prohibitions Against Fraudulent, Deceptive, and Unfair Advertising.

107.    In addition to violating the aforementioned statutes, Defendant has violated the traditional common law duty not to commit fraud and mislead consumers about the characteristics and qualities of its Products, as well as traditional state law prohibitions on false and misleading advertising that long predate the FDCA or Sherman Law.

108.    Defendant's use of nutrient content claims while failing to include the required disclosure statement is misleading. Reasonable consumers are unaware of the levels of concerning nutritional components and upon seeing front-label nutrient

content claims reasonably believe that the product is health-focused and doesn't include dangerous levels of saturated fats. Had Defendant complied with the law, the disclosure statement would have revealed that the Products contain concerning and dangerous levels of saturated fat. Had reasonable consumers been informed that Products contained concerning and dangerous levels of saturated fat, as required by FDA regulations, they would not have purchased or would have paid less for the Products.

109.    Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. The average reasonable consumer had no reason to suspect that Defendant's representations and omissions on the packages were misleading.

110.    Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done with its nutrient content claims.

111.    Defendant's duty not to mislead consumers about the quality or nutritional value of its Products does not stem from either the FDCA or California's Sherman Law. Instead, that duty stems from traditional California prohibitions on misleading and deceptive advertising (including prohibitions on fraudulent omissions) that long predate the FDCA or Sherman Law, including the UCL's fraud prong, the CLRA, the FAL, and the common law tort of fraud.

112.    In addition, the Product's labeling is misleading, and thus misbranded, because "it fails to reveal facts that are material in light of other representations." 21 C.F.R § 1.21.

113.    Defendant's voluntary deceptions challenged herein "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such omitted facts include the mandatory disclosure statement which alerts consumers to the dangerously high levels of saturated fat and the detrimental health consequences of consuming the Products.

114.    Defendant fails to include mandatory disclosure statements that must alert consumers to examine the Nutrition Information because the Product contains high levels of saturated fat. These disclosures are mandatory because the Product contains numerous nutrient content claims, and because the Product contains high, dangerous levels, they are required so consumers can put these claims in their proper context.

115.    For example, numerous competitors follow this regulation and provide proper disclosure statements when required:

a.    Other food products that contain similarly high levels of saturated fat are not required to include disclosure statements because they do not *voluntarily* place nutrient content claims on their products.

b.    This competitor has similar fat and saturated fat levels yet makes no nutrient content claims and includes no disclosure statement:




c.  In contrast, competitors use nutrient content claims yet include

disclosure statements:[36]



<hr />

[36] Emphasis added with red arrow.

  

116. Defendant is not required to put nutrient content claims on its Products.

117. Defendant voluntarily places nutrient content claims on its Products in order to motivate consumers into purchasing the Products.

118. When this voluntary information is added, the Defendant must include mandatory disclosure statements in order to avoid consumer confusion and to ensure that the consumer is properly informed.

119. Because Defendant's Products share the same shelves as competing products – which properly inform consumers – Defendant is placed at a competitive advantage over its competitors that act in good faith with consumers and compliance in mind.

## I. Defendant Misleadingly Markets the Products to Increase Profits and Gain a Competitive Advantage.

120. In making unlawful, false, misleading, and deceptive representations, Defendant distinguishes the Products from its competitors' products. Defendant knew

1
2
3
4
5
6
7
8

and intended that consumers would purchase, and pay a premium for, products labeled with nutrient content claims and that failed to reveal they contain dangerous and concerning levels of saturated fat. By using this labeling and marketing strategy, Defendant states that the Products are superior to, better than, and more nutritious and healthful than other products that do not make nutrient content claims, or that properly provide the required disclosure statement and otherwise do not mislead consumers about the quality or nutritional value of their products.

### J. Defendant Intended to Market the Products with Nutrient Content Claims and Without the Required Disclosure Statements.

9
10

11
12
13
14
15
16
17
18
19
20

121.    At all relevant times, Defendant knew that consumers pay a price premium for products that make nutrient content claims, and also pay a premium for products that provide greater nutrition. And, at all relevant times, Defendant knew the disclosure statement ("SEE NUTRITION INFORMATION FOR TOTAL FAT AND SATURATED FAT CONTENT.") it now includes was required. By labeling its Products with nutrient content claims and/or omitting the required disclosure statement, Defendant was and/or is able to both increase its sales and retain more profits.

21
22
23
24
25
26

122.    Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors that do not misrepresent the nutritional benefits of its products, and/or (ii) commanding a higher price for its Products because consumers will pay more for the Products due to consumers' demand for products with nutrient content claims.

27
28

123.    The market for health-focused products is continuing to grow and expand, and because Defendant knew and knows consumers rely on representations

about the nutritional benefits of food products, Defendant had and has an incentive to make such unlawful and misleading representations.

124.    To capitalize on the growing market, Defendant continues to launch new product lines and flavors to diversify its portfolio to maintain its competitive edge. And while Defendant may not continue to replicate its misrepresentations on new products, Defendant has not corrected or otherwise advised consumers of its past misrepresentations. It is therefore likely that Defendant will continue to unlawfully and/or misleadingly advertise and continue to benefit from the sale of the Products and perpetuate the misrepresentations regarding the nutritional quality of the Products.

### K. Reasonable consumers relied on Defendant's misrepresentations and omissions to their detriment.

125.    Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

126.    Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

127.    Defendant's unlawful, deceptive conduct leads reasonable consumers to believe that the Products are healthier and more nutritious than competing products.

128.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled the Plaintiff and the Class Members.

**L. Defendant's wrongful conduct caused Plaintiff's and the Class Members' injuries.**

129.   Defendant knew and knows that consumers are willing to pay more for food products that contain nutrient content claims.

130.   Defendant also knew and knows that disclosure statements reduce consumer demand for food products.

131.   As a result of these unfair and deceptive practices, Defendant has collected millions of dollars from the sale of the Products that they would not have otherwise earned. Plaintiff and Class Members paid money for food items that are not what they purported to be or what they bargained for. They paid a premium for the Products when they could have instead bought other, less expensive products that do not purport to contain the health benefits of Defendant's Products or include the mandatory disclosure language which puts the nutrient content claims in the proper context for consumers.

132.   In making the false and misleading representations and omissions described herein, Defendant knew and intended that consumers would pay for, and/or pay a premium for, a product containing nutrient content claims.

133.   As an immediate, direct, and proximate result of Defendant's false and misleading representations, Defendant injured the Plaintiff and the Class Members in that they:

a.   Paid a sum of money for Products that were not what Defendant represented;

b.   Paid a premium price for Products that were not what Defendant represented;

c.  Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted;

d.  Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

e.  Could not be used for the purpose for which they were purchased; and

f.  Were of a different quality than what Defendant promised.

134.    Had Defendant not made the false, misleading, and deceptive representations, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

135.    Plaintiff and the Class Members paid for Products that were purported to be health-focused and better for them but received Products that consisted of dangerously high levels of saturated fat.  The products Plaintiff and the Class Members received were worth less than the products for which they paid.

136.    Based on Defendant's misleading and deceptive representations, Defendant was able to, and did, charge a premium price for the Products over the cost of competitive products not bearing the representations and/or making proper disclosures which adequately inform consumers.

137.    Plaintiff and the Class Members all paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products.

1    Consequently, Plaintiff and the Class Members have suffered injury in fact and lost

2    money as a result of Defendant's wrongful conduct.

3                    **CLASS DEFINITIONS AND ALLEGATIONS**

4        138.   Plaintiff, pursuant to Federal Rule of Civil Procedure 23, brings this

5    action on behalf of the following classes:

6

7        a.   California Class: All persons who purchased Defendant's Products

8             within the State of California and within the applicable statute of

9             limitations;

10       b.   Nationwide Class: All persons who purchased Defendant's Products

11            within the United States and within the applicable statute of limitations

12            period (collectively, the "Class," "Classes," and "Class Members");

13

14       c.   The statute of limitations for the CLRA is three years dating back from

15            the date of the filing of this Complaint;

16       d.   The statute of limitations for the FAL is three years dating back from

17            the date of the filing of this Complaint;

18

19       e.   The statute of limitations for the UCL is four years dating back from the

20            date of the filing of this Complaint;

21       f.   The statute of limitations for Unjust Enrichment is four years dating

22            back from the date of the filing of this Complaint;

23

24       g.   The statute of limitations for the UTPCPL is six years dating back from

25            the date of the filing of this Complaint.

26       139.   Excluded from the Classes are Defendant, its parents, subsidiaries,

27    affiliates, officers, and directors, those who purchased the Products for resale, all

28    persons who make a timely election to be excluded from the Classes, the judge to

                                – 45 –

whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

140.    The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, hundreds of thousands of units of the Products to Class Members.

141.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative Classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

    a.  whether Defendant misrepresented material facts concerning the Products on the packaging of every product;

    b.  whether Defendant misrepresented material facts concerning the Products in print and digital marketing of every product;

    c.  whether Defendant's conduct was unfair and/or deceptive;

    d.  whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

    e.  whether Plaintiff and the Class are entitled to equitable relief; and

    f.  whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

142.    Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the Classes, purchased Defendant's Products bearing

nutrient content claims and Plaintiff sustained damages from Defendant's wrongful conduct.

143.    Plaintiff will fairly and adequately protect the interests of the Classes and has retained counsel that is experienced in litigating complex class actions.

144.    Plaintiff has no interests which conflict with those of the Classes.

145.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

146.    The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate equitable relief with respect to the Classes as a whole.

147.    The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from

performing the challenged acts, whereas another might not. Additionally, individual

actions could be dispositive of the interests of the Classes even where certain Class

Members are not parties to such actions.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Unfair Competition Law ("UCL")**
**Business and Professions Code § 17200 et seq.**
**(On Behalf of the California Class)**

148.    Plaintiff repeats and realleges each and every fact and allegation

contained in the foregoing paragraphs as if fully set forth herein.

149.    Plaintiff brings this cause of action pursuant to the UCL on her own

behalf and on behalf of all other persons similarly situated.

150.    The UCL prohibits "any unlawful, unfair... or fraudulent business act or

practice." Cal. Bus & Prof. Code § 17200.

151.    Within four (4) years preceding the filing of this lawsuit, and at all times

mentioned herein, Defendant has engaged, and continue to engage, in unlawful,

unfair, and fraudulent trade practices in California by engaging in the unlawful,

unfair, and fraudulent business practices outlined in this complaint.

152.    In particular, Defendant has engaged, and continues to engage, in

unlawful practices by, without limitation, violating the following state and federal

laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the

advertising provisions of the Sherman Law (Article 3), including without limitation,

California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the

misbranded food provisions of the Sherman Law (Article 6), including without

limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760,

110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), et seq. and FDA regulations, including but not limited to 21 C.F.R. 21 C.F.R. § 101.9 (c)(7), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

153.    In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) unlawfully making a nutrient content claim on the Products' packaging without complying with the regulatory requirements for making nutrient content claims set forth in 21 C.F.R. § 101.13 and incorporated by reference by California's Sherman law; (ii) failing to provide a disclosure statement alerting consumers to the dangerously high levels of saturated fat contained in the Products; and (iii) misleading reasonable consumers regarding the health and nutritional benefits of the Products by emphasizing the positive aspects of the Products without informing consumers of the Products' negative aspects.

154.    Plaintiff and those similarly situated relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

155.    Defendant's acts and omissions have deceived and are likely to deceive the general public.

156.    Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful and fraudulent trade

practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

157.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

158.    As a direct and proximate result of such actions, Plaintiff and the other California Class Members have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and the California Class Members lost the amount they paid for the Products.

159.    As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

160.    Plaintiff seeks, individually and on behalf of those similarly situated, equitable relief, including the restitution for the premium and/or full price that they or others paid to Defendant as a result of Defendant's conduct. Plaintiff and the Class lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the California Sherman Law does not provide a direct cause of action, so Plaintiff and the Class must allege those violations as predicate acts under the UCL to obtain relief.

161.    Plaintiff also seeks equitable relief, including restitution, with respect to her UCL "fraudulent" prong claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiff and the Class may be unable to obtain monetary or declaratory relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v. Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

162.    Plaintiff seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

**COUNT II**
**Violation of California's False Advertising Law ("FAL")**
**Business and Professions Code § 17500 et seq.**
**(On Behalf of the California Class)**

163.    Plaintiff repeats and realleges each and every fact and allegation contained in paragraphs 1 - 147 as if fully set forth herein.

164.    Plaintiff brings this cause of action pursuant to the FAL on her own behalf and on behalf of all other persons similarly situated.

165.    The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, in any advertising device or in any other manner or means whatever, including over the Internet, any statement, concerning personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

166.    Beginning at an exact date unknown to Plaintiff, but within four (4) years preceding the filing of the Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

167.    Defendant knowingly disseminated misleading claims regarding the Products in order to mislead the public about the health and nutritional benefits of the Products.

168.    Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiff

and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing Defendant's Products or paying less for them.

169.    Defendant's acts and omissions have deceived and are likely to deceive the general public.

170.    Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

171.    The aforementioned practices, which Defendant used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

172.    As a direct and proximate result of such actions, Plaintiff and the other members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

173.    Plaintiff seeks, on behalf of herself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph

only hypothetically and as an alternative to any contrary allegations in his other causes of action, in the event that such causes of action will not succeed. Plaintiff and the Class may be unable to obtain monetary or declaratory relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show class-wide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent Class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'"). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

174.    Plaintiff seeks, on behalf of herself and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

175.    Plaintiff seeks, on behalf of herself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money

and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. The failure to correct past violations and this expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it is not entitled. Plaintiff, those similarly situated, and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**COUNT III**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**Business and Professions Code § 1750 et seq.**
**(On Behalf of the California Class)**

176.    Plaintiff repeats and realleges each and every fact and allegation contained in paragraphs 1 - 147 as if fully set forth herein.

177.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

178.    At all times relevant hereto, Plaintiff and members of the California Class were "consumer[s]," as defined in Civil Code section 1761(d).

179.    At all times relevant hereto, Defendant is a "person," as defined in Civil Code section 1761(c).

180.    At all times relevant hereto, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in Civil Code section 1761(a).

181.    The purchases of the Products by Plaintiff and members of the California Class were and are "transactions" within the meaning of Civil Code section 1761(e).

182.    Defendant's acts, practices, and omissions, set forth in this Complaint, led customers to falsely believe that the Products were healthier and "better for them" than they were in reality based upon Defendant's use of nutrient content claims without including the *mandatory* disclosure statements.

183.    Defendant's representations and omissions violate the CLRA in at least the following respects:

a.    In violation of California Civil Code §1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold;

b.    In violation of Civil Code § 1770(a)(5), Defendant represented that the Products have characteristics, ingredients, uses, benefits, and quantities which they do not have;

c.    In violation of Civil Code § 1770(a)(7), Defendant represented that the Products are of a particular standard, quality, or grade, which they are not; and

d.    In violation of Civil Code § 1770(a)(9), Defendant advertised the Products with an intent not to sell the products as advertised.

184.    Defendant's actions as described herein were done with conscious disregard of Plaintiff's and California Class Members' rights and was wanton and malicious.

185.    Pursuant to Civil Code section 1782, Plaintiff notified Defendant in writing by certified mail of the alleged violations of the CLRA and demanded that

Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.[37]

186.    With respect to those violations of Civil Code § 1770 as to which notification was received and accepted by Defendant, Defendant, by agreement of counsel for the Parties, is due to respond in writing on or before January 22, 2025. (It is Plaintiff's understanding that Defendant does not intend to meet the demands set forth in said Notice.) Accordingly, Plaintiff hereby requests damages from Defendant as provided for in Civil Code § 1780 including:

        a.  actual damages in excess of the jurisdictional limits of this Court;

        b.  statutory damages allowable under Civil Code § 1780;

        c.  punitive damages;

        d.  attorneys' fees;

        e.  court costs and interest; and

        f.  any other relied which the court deems proper.

### COUNT IV
### Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law,
### 73 Pa. Cons. Stat. §§ 201-2 and 201-3, *et seq.*
### (On Behalf of the Nationwide Class)

187.    Plaintiff repeats and realleges each and every fact and allegation contained in paragraphs 1 - 147 as if set forth herein.

188.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against the Defendant.

189.    Defendant is a "person," as meant by 73 Pa. Cons. Stat. § 201-2(2).

---

[37] *See also* Paragraph 26(h) *supra.*

190.    Plaintiff and Class Members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

191.    Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. § 201-3, including the following: representing that its goods and services have characteristics, uses, benefits, and qualities they do not have (73 Pa. Cons. Stat. § 201-2(4)(v)); representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Cons. Stat. § 201-2(v)(vii)); and advertising its goods and services with intent not to sell them as advertised (73 Pa. Cons. Stat. § 201-2(4)(ix)); and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (73 Pa. Cons. Stat. § 201-2(v)(xxi)).

192.    As alleged more fully above, Defendant through its misrepresentations and omissions has violated the Unfair Trade Practices and Consumer Protection Law by misleadingly, deceptively, and falsely representing to Plaintiff and the other members of the Nationwide Class that the Products do not contain dangerously high level of saturated fat.

193.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

194.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and the Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

195.    Plaintiff and other members of the Class lost money or property as a result of Defendant's violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were not accurately represented and contained dangerously high levels of saturated fat; (b) they paid a substantial price premium compared to other food products due to Defendant's misrepresentations and omissions; and (c) the Products do not have the characteristics, uses, or benefits as promised.

196.    Plaintiff and the Nationwide Class seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief this Court deems necessary or proper.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

197.    Plaintiff repeats and realleges each and every fact and allegation contained in paragraphs 1 - 147 as if fully set forth herein.

198.    Plaintiff and members of the Class conferred a benefit on the Defendant by purchasing the Products.

199.    Defendant has been unjustly enriched in retaining the revenues from Plaintiff's and Class members' purchases of the Products, which retention is unjust and inequitable because they were premised on unlawful, deceptive, fraudulent, and misleading conduct.

200.    Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class members for its unjust enrichment, as ordered

by the Court. Plaintiff and those similarly situated have no adequate remedy at law to obtain this restitution.

201.   Plaintiff, therefore, seeks an order requiring Defendant to make restitution to Plaintiff and other members of the Class.

### RELIEF DEMANDED

WHEREFORE, Plaintiff, individually and on behalf the Class Members, seeks judgment and relief against Defendant, as follows:

a)   For an order declaring: (i) this is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the proposed Classes described herein; and (ii) appointing Plaintiff to serve as representative for the Classes and Plaintiff's counsel to serve as Class Counsel;

b)   For an order:

  i.   enjoining Defendant from continuing to engage in any ongoing unlawful conduct set forth herein including the marketing and selling of Products without the required disclosure statement; and

  ii.   requiring Defendant to correct and disclose its past unlawful activities set forth herein;

c)   For an order awarding restitution of the monies Defendant wrongfully acquired by its illegal and deceptive conduct;

d)   For an order requiring disgorgement of the monies Defendant wrongfully acquired by its illegal and deceptive conduct;

e)   For compensatory and punitive damages, including actual and statutory damages, arising from Defendant's wrongful conduct and illegal conduct;

f)  For an award of reasonable attorneys' fees and costs and expenses incurred in the course of prosecuting this action; and

g)  For such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all causes of action so triable.


Dated: January 9, 2025

**POPE McGLAMRY, P.C.**

/s/ Caroline G. McGlamry
Caroline G. McGlamry (Cal. Bar No. 308660)
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706
carolinemcglamry@pmkm.com

*Counsel for Plaintiff and the Proposed Class*